# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NORTHEAST DIVISION

| | |
|---|---|
| JEFF OWEN, | ) |
| Plaintiff, | ) |
| v. | ) No. 2:10-00114 |
| | ) Judge Sharp |
| CITY OF LAFAYETTE, TENNESSEE, and KEITH SCRUGGS, Individually and In His Official Capacity, | ) |
| Defendants. | ) |

## MEMORANDUM

This litigation arose after Plaintiff, Jeff Owen, quit his employment as a firefighter after sending sexually explicit text messages to the fire chief's girlfriend. The parties have filed cross motions for summary judgment (Docket Nos. 19 & 24) and those motions have been fully briefed. Having considered the record and the arguments of the parties, the Court will deny Plaintiff's motion for summary judgment on the issue of liability, grant Defendant's motion with respect to Plaintiff's federal claims, and decline to exercise jurisdiction over Plaintiff's state law claim.

## I. FACTUAL BACKGROUND

Plaintiff began full-time employment with the Defendant City of Lafayette, Tennessee Fire Department in January of 2010. While employed, Plaintiff did his job well, had no attendance issues, and was never suspended.

At the time Plaintiff became a full-time firefighter, Defendant Keith Scruggs was the Fire Chief ("Chief Scruggs") and was Plaintiff's supervisor. Chief Scruggs was involved in a full-time dating relationship with Debbie Dies ("Dies"), a woman who, on one occasion back in 1990, had a

1

"one-minute sexual experience" with Plaintiff.

Dies and Plaintiff were friends from 1990-1992. Thereafter, Plaintiff had very limited contact with Dies,[1] until she and Chief Scruggs began dating, at which point Plaintiff would "occasionally" socialize with the couple.

In March, 2010, Plaintiff and Dies began texting each other. At the time, Plaintiff knew Dies was dating Chief Scruggs.

The messages Plaintiff sent to Dies dealt with the one time they had their brief sexual liaison, and Plaintiff's suggestion that the two have sex again. Dies testified in her deposition she did not want to participate in the exchanges and was prepared to tell Plaintiff. However, before any such conversation could take place, Dies received a text from Plaintiff while she was with Chief Scruggs. Dies confessed that she had received several texts from Plaintiff and showed the last three or four texts to Chief Scruggs.

Initially, Chief Scruggs laughed, thinking that Plaintiff was just kidding around. However, Dies assured him Plaintiff was serious, and she could prove it to him by continuing to text Plaintiff.

The record contains Dies handwritten account of the text exchanges between her and Plaintiff from March 11 to 22, 2010. Plaintiff's messages were explicit, and the following are representative samples which give a flavor to the type of messages Plaintiff sent to Dies:

- "Do you remember giving me a BJ in the bathroom of the TigerMart that night?"
- "I swear, why do you think I wanted it so bad that night. No kidding. Really you

---

[1] Occasionally, Plaintiff would receive an e-mail containing a "joke or something" from Dies. (Pf. Depo. at 50). Dies claims that years ago when she worked at Sumner Employment Exchange in Portland, Tennessee, Plaintiff came by and told her he wanted to have sex with her again, that when she worked at Rent to Own, Plaintiff pleaded with her to have sex with him, and that, late one night, Plaintiff phoned her and said he wanted to have sex with her. Dies testified in her deposition that she was "uncomfortable" with Plaintiff's overtures, and that she was bothered and scared by the phone call propositioning sex.

2

did. And don't worry, it was great. I'm home now. Can't play no more.[2] Later."

- "Damn, you are making me hard just thinking about it, LOL."

- "You got some stray [sex] I might be interested in?"

- "I heard you got a fire at your apartment. Need my hose, huh?"

- "Right baby, you want to ride on my fire engine, LOL? Make your siren wail and yelp."

(Pf. Depo. Ex. 2) (footnote added).

Dies testified in her deposition that, upon receiving such texts, she felt "dirty," and "raped without the rape." She also testified that, at some point during the period Plaintiff was texting her, she saw him drive by her apartment, and she was "scared" and felt Plaintiff was stalking her. Finally, she testified that she considered getting a judicial order of protection against Plaintiff. (Dies Depo. at 29-33).

After reviewing additional text messages, and after Dies told him that he had to do something to "make this stop or I will," (Dies Depo. at 29), Chief Scruggs determined that Plaintiff was not joking around and summoned him to a meeting. The meeting was held on March 25, 2010, a meeting which Assistant Chief Troy Brawner ("Asst. Chief Brawner") also attended.

At the meeting, Chief Scruggs displayed some of the text messages to Plaintiff, and told Plaintiff that he wanted him to resign or he would take "all this across the street to the City Council and the Mayor and let them deal with you." (Id. at 95). According to Plaintiff, Chief Scruggs also told him, "if you don't want to resign . . . Debbie is willing to - - to charge you with sexual

---

[2] During his deposition, Plaintiff stated he told Dies that he could not play anymore because his wife was home and he did not want her to know that he was texting Dies, or his wife to become aware of that activity. He also testified that he did not want Chief Scruggs to know that he was texting Dies.

3

harassment," "I'll have you registered as a sex offender in the State of Tennessee," "you ain't never going to find a job, big boy. Never" and reiterated "you can either give me your resignation, or we'll go take care of this across the street." (Id. at 102).[3]

At one point, Chief Scruggs got up from his chair and headed towards Plaintiff, but Asst. Chief Brawner stepped in between the two and held Chief Scruggs back. According to Plaintiff, Chief Scruggs was "extremely mad," "real furious," and cursing. (Id. at 95-96). Plaintiff told Asst. Chief Brawner, "Let him go, . . . let him hit me . . . I probably deserve this." (Id. at 98).[4] At some point during the meeting, Plaintiff said that what he did was wrong,[5] and that he might have a "sex problem." (Id. at 104-105).

Notwithstanding the foregoing, Plaintiff testified that he asked Chief Scruggs what he (Plaintiff) was going to do because he needed a job, and was "pretty much begging." (Id. at 103). In response, Chief Scruggs pulled out the city's policy manual "trying to find a way to - - to see, you know - - to see if there was some way to get by this" and "to help me [Plaintiff]" Id. After looking at the manual, Chief Scruggs said, "I can't." (Id.). Plaintiff also testified in his deposition that both he and Chief Scruggs cried during the meeting, and that Chief Scruggs told him he was the "best damn employee he had and he hated to do it to me, but I done it to myself." (Id. at 111-112).

Plaintiff dictated his own resignation which Chief Scruggs typed and Plaintiff signed. At the

---

[3] For his part, Chief Scruggs testified that he "was trying to be a man about it" and gave Plaintiff the "luxury of resigning" which would lead to "a good recommendation if he would go ahead and do that," or Chief Scruggs could "take it to the mayor, and it would go from there[.]" (Scruggs Depo. at 20).

[4] Chief Scruggs had a carry permit and sometimes had a gun in his desk drawer. During his deposition, Plaintiff admitted that he "never saw a gun," nor did Chief Scruggs ever reach in his desk drawer, or anywhere else, in order to access a gun. (Id. at 99).

[5] Ironically, before Plaintiff began texting Dies, he approached Chief Scruggs and alerted him to a problem in the fire department regarding inappropriate contact between some firefighters and the wives and girlfriends of other firefighters. (Scruggs Depo. at 77).

4

time Plaintiff resigned, he knew it was up to the City Council to dismiss an employee,[6] and that the City Council would have a meeting to approve his resignation.

Months after the resignation, Plaintiff went to Chief Scruggs' home and apologized, an apology which Chief Scruggs accepted. Plaintiff also told Chief Scruggs that "in the future" he would like to again work at the Fire Department, and Chief Scruggs said, "We'll see what we can do." (Id. at 121-122).[7]

Plaintiff's resignation was accepted by the City Council on April 6, 2010. The members voting to accept his resignation did not know the reason for, or circumstances surrounding, Plaintiff's resignation and they had no involvement in Plaintiff's decision to resign.[8] Chief Scruggs did, however, tell the Mayor that he had proof Plaintiff had been texting his girlfriend, he and Plaintiff had discussed the matter, and they "thought it best at this time that he [Plaintiff] resign." (Scruggs Depo. at 29).

There is no city policy relating to texting, and firefighters sometime communicate with each other via texting. Further, there are no policies or regulations which prohibit firemen from dating someone else's girlfriend. Nevertheless, Chief Scruggs testified that there had been three instances

---

[6] The parties agree that "it was up to the City Council to dismiss an employee," but elsewhere agree that "[u]nder the City's Charter, the Mayor has exclusive authority to discharge an employee of the city." (See, Defendants' Statement of Fact Nos. 40 & 69). These seemingly inconsistent statements ultimately are of no moment, because there is no suggestion that the Fire Chief had authority to discharge an employee without approval of someone higher up, be it the Mayor or City Council.

[7] At some later point, Plaintiff did, in fact, apply for a position with the Fire Department.

[8] These statements of fact are supported by the Affidavits of City Council members. (Docket Nos. 29-34). In response to Defendants' Statement of Facts in relation to these fact, Plaintiff denies them and, as a basis, states "[s]ee citations in plaintiff's previous memorandum of law for partial summary judgment." (Docket No. 37 at 16-17). This method of disputing factual contentions does not comply with Local Rule 56.01 which requires "specific citation to the record." Regardless, what City Council did or did not know is irrelevant because Plaintiff has not presented sufficient evidence to present a jury question on his federal claims.

in the past where firefighters had contact with another firefighter's wife or girlfriend, it was "becoming a problem in the department, and affirmative action had to be taken." (Id. at 38).[9]

Based upon the foregoing events, Plaintiff filed an Amended Complaint (Docket No. 2) in this Court in which he sets forth both federal and state law claims. He asserts that his First Amendment rights to free speech and freedom of association were infringed by Defendants, and that he was constructively discharged in violation of 42 U.S.C. § 1983. He also contends that he was subjected to a common law civil assault by Chief Scruggs.

## II. STANDARD OF REVIEW

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." Ferro Corp. v. Cookson Group, PLC, 585 F.3d 946, 949 (6th Cir. 2009). A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the Court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set

---

[9] Chief Scruggs conceded, however, that on one occasion a fireman who "trying to mess around with" another person's girlfriend or wife was not fired for that conduct.

forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. APPLICATION OF LAW

As indicated, the parties have filed cross motions for summary judgment, although Plaintiff's motion is limited to the issue of liability. The Court considers the arguments raised by the parties in tandem and in relation to the specific claims made by Plaintiff.

**A. First Amendment Claim**

In support of his own motion for summary judgment and in response to Defendants' motion, Plaintiff relies extensively on the United States Supreme Court decision in Roberts v. U.S Jaycees, 468 U.S. 609 (1984) "which has not been overruled or modified," for the proposition that he has a constitutional right to "personal friendship," and that Defendants' termination of him violated this clearly established right to the freedom to associate. (Docket No. 36 at 1).[10] The governing law,

---

[10] The Court notes that, in his Amended Complaint, Plaintiff also claims his right to free speech under the First Amendment was violated as well. While "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern," Garcetti v. Ceballos, 547 U.S. 410, 417 (2006), in order for an employee "[t]o establish that his speech was constitutionally protected, a public employee must show that he was speaking as a private citizen, rather than pursuant to his official duties; that his speech involved a matter of public concern; and, if so, that his interest

7

however, is a bit more complicated and requires more consideration than that afforded by Plaintiff.

In Roberts, the Supreme Court noted that it had "long recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State." Roberts, 468 U.S. at 618. The Court went on to discuss those types of relationships which it had deemed worthy of constitutional protection and those that are not worthy of such protection, writing,

> . . . Without precisely identifying every consideration that may underlie this type of constitutional protection, we have noted that certain kinds of personal bonds have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs; they thereby foster diversity and act as critical buffers between the individual and the power of the State. . . . Moreover, the constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others. Protecting these relationships from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty. . . .
>
> The personal affiliations that exemplify these considerations, and that therefore suggest some relevant limitations on the relationships that might be entitled to this sort of constitutional protection, are those that attend the creation and sustenance of a family—marriage . . . ; childbirth . . . ; the raising and education of children . . . ; and cohabitation with one's relatives. . . . Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life. Among other things, therefore, they are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship. As a general matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty. Conversely, an association lacking these qualities—such as a large

---

as a citizen in commenting on the matter outweighed 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" Westmoreland v. Sutherland, 662 F.3d 714, 719 (6th Cir. 2011). There is no evidence in this case that Plaintiff's speech involved a matter of public concern. Therefore, dismissal of Plaintiff's free speech claim is warranted.

> business enterprise—seems remote from the concerns giving rise to this constitutional protection. Accordingly, the Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse that would not apply to regulations affecting the choice of one's fellow employees.

Id. at 619-620 (internal citations omitted). The Court went on to hold that "[b]etween these poles, of course, lies a broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State," and "[d]etermining the limits of state authority over an individual's freedom to enter into a particular association therefore unavoidably entails a careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments."

In Bd. of Dir. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 544 (1987), the Supreme Court wrote that "Roberts provide the framework for analyzing" a freedom of association claim. After noting its observations in Roberts that the right to associate affords protection "in two distinct senses" – the protection "against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships," and the "the freedom of individuals to associate for the purpose of engaging in protected speech or religious activities," the Court wrote that it has "not held that constitutional protection is restricted to relationships among family members." Rotary, 481 U.S. at 544. Nevertheless, the First Amendment only "protects those relationships . . . that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'" Id. at 545 (quoting Roberts, 468 U.S. at 620). Whether a relationship warrants the protection of the First Amendment, as Roberts explains, can be determined only after assessing where on the "spectrum from the most intimate to the most attenuated of personal attachments,'" the relationship lies. Id. "In determining whether a particular association

9

is sufficiently personal or private to warrant constitutional protection, [a court] consider[s] factors such as size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship." Id. at 546.

Identifying Roberts and Rotary as "[t]he two seminal cases defining the right of intimate association," the Sixth Circuit in Marcum v. McWhorter, 308 F.3d 638 (6th Cir. 2002) addressed a deputy sheriff's claim that his First Amendment right to association was violated when he was fired as a result of his intimate relationship and cohabitation with a married woman. Rejecting the claim, the Sixth Circuit observed that Roberts requires that a court look to any of a number of factors and, while a one-on-one relationship would seem to fit the factors relating to size, selectivity, and whether others are excluded from critical aspects of the relationship," Rotary, 481 U.S. at 546, "the adulterous nature of the relationship does not portray a relationship of the most intimate variety afforded protection under the constitution." Marcum, 308 F.3d 635.

Marcum is instructive in this case, even in the absence of an adulterous relationship. The record reflects that, almost twenty years after a very brief sexual encounter in 1991, and with hardly any contact in the interim, Dies began receiving unwelcome and sexually explicit texts.[11] Such a situation hardly portrays "a relationship of the most intimate variety."

Moreover, just as the Sixth Circuit in Marcum took into account the "objective characteristics" that there was an adulterous relationship in that case, the Court in this case takes into

---

[11] In his response, Plaintiff argues that "defendant's assertion that plaintiff's conduct was offensive and frightening to her is in dispute and cannot be resolved at the summary judgment stage. Plaintiff then argues that "Ms. Dies is a citizen of this State but is not an employee of the defendant. Does the government control who one speaks or associates with on their spare time? Common sense and legal authority say no." (Docket No. 36 at 2). This argument, seemingly apropos of nothing, does not rebut the fact that Dies made clear in her deposition that Plaintiff's texting was unwanted and that she was concerned by Plaintiff's continued interest in her.

account the characteristic that the relationship was hardly reciprocal inasmuch as Dies found Plaintiff's conduct offensive and frightening. On a "spectrum from the most intimate to the most attenuated of personal attachment," Roberts, 468 U.S. at 620, the relationship (if it can even be called that) was either attenuated, or very close to it. It certainly was not intimate, let alone a "most intimate" association.

Even assuming Dies and Plaintiff somehow had an association that warranted First Amendment protection, summary judgment is still appropriate in favor of Defendants on the basis of qualified immunity. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity attaches if an official reasonably believes that his actions were lawful in light of clearly established law, and this remains so although the belief is subsequently shown to be erroneous. Harris v. Bornhorst, 513 F.3d 503, 511 (6th Cir. 2008). "Thus, even if a factual dispute exists about the objective reasonableness of the [official's] actions, a court should grant the officer qualified immunity if, viewing the facts favorably to the plaintiff, an [official] reasonably could have believed that the [action] was lawful." Kennedy v. City of Villa Hills, 635 F.3d 210, 214 (6th Cir. 2011).

"Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." O'Malley v. City of Flint, 652 F.3d 662, 667 (6th Cir. 2011). "Plaintiff must show both that, viewing the evidence in the light most favorable to h[im], a constitutional right was violated and that the right was clearly established at the time of the violation." Chappell v. City of Cleveland, 585 F.3d 901, 907 (6th Cir. 2009). This is generally done by pointing to "'binding

precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point.'" Kennedy, 635 F.3d at 214-15 (citation omitted). "If plaintiff fails to show either that a constitutional right was violated or that the right was clearly established, []he will have failed to carry h[is] burden." Chappell, 585 F.3d at 907.

In his reply brief, Plaintiff cites Roberts and Corrigan v. City of Newago, 55 F.3d 1211 (6th Cir. 1995), and argues that Chief Scruggs' assertion that he did not know "it was a violation of the constitutional amendments to fire someone for speaking to a fellow citizen borders on the absurd and should not be believed." (Docket No. 36 at 3). However, Roberts, which involved Minnesota's efforts to eliminate alleged gender-based discrimination by the Jaycees, spoke about a spectrum of relationships and would not have placed Chief Scruggs on notice that what he did violated the freedom of association clause of the First Amendment. See, Holzemer v. City of Memphis, 621 F.3d 512, 517 (6th Cir. 2010) (citations omitted) ("'[f]or a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right'" and "in light of pre-existing law the unlawfulness must be apparent'"). Nor would Corrigan have supplied the notice because, as the Sixth Circuit pointed out in Marcum, Corrigan "did not analyze or discuss how to determine which personal affiliations fall into the category or protected intimate relationships, as such an analysis was irrelevant to the facts of the case which concerned the right to associate for purposes of engaging in expressive activity protected by the First Amendment." Marcum, 308 F.3d at 640 n. 2.

Based upon the foregoing, summary judgment will be granted in Defendants' favor on Plaintiff's First Amendment claim.

**B. Constructive Discharge Claim**

"A constructive discharge may constitute a deprivation of property within the meaning of the Fourteenth Amendment." <u>Nunn v. Lynch</u>, 113 Fed. Appx. 55, 59 (6th Cir. 2004). "To demonstrate constructive discharge, a plaintiff must adduce evidence to show that (1) 'the employer ... deliberately create[d] intolerable working conditions, as perceived by a reasonable person,' (2) the employer did so 'with the intention of forcing the employee to quit,' and (3) 'the employee ... actually quit.'" <u>Savage v. Gee</u>, 665 F.3d 732, 739 (6th Cir. 2012) (quoting, <u>Moore v. KUKA Welding Sys. & Robot Corp.</u>, 171 F.3d 1073, 1080 (6th Cir. 1999)).

For any of a number of reasons, Plaintiff's constructive discharge claim fails. First, he submitted a resignation, a resignation which he himself worded, and "[e]mployee resignations . . . are presumed to be voluntary." <u>Nunn</u>, 113 Fed. Appx. at 60. While a "resignation will be deemed involuntary for due process purposes: 1) when the employer forces the resignation or retirement by coercion or duress, or 2) when the employer obtains the resignation or retirement by deceiving or misrepresenting a material fact to the employee," Plaintiff does not suggest any deception, nor does he show undue coercion or duress because he was given the option of resigning or letting the city council decide the matter. <u>See</u>, <u>Driggers v. City of Owensboro</u>, 110 Fed. Appx. 449, 506-07 (6th Cir. 2004) (police officer who was under investigation by the police department and was informed that she likely would be disciplined or terminated if she did not resign was not constructively discharged even though "her prospect of avoiding some form of discipline appeared to be nil" because "it was speculative for her to conclude that the inevitable result of disciplinary charges ... would be her termination"); <u>Talley v. Crosby</u>, 2009 WL 649778 at **5-6 (M.D. Tenn. Mar. 11, 2009) (relying on <u>Driggers</u> and holding summary judgment appropriate on constructive discharge claim where record showed that plaintiff chose to resign amid allegations of improper conduct "rather than to permit the

town to complete its investigation . . . for fear of the outcome of the investigation").

Second, to establish a constructive discharge, a plaintiff must show that there were "intolerable working conditions," that is working conditions which are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." (Smith v. Henderson, 376 F.3d 529, 533-34 (6th Cir. 2003). Plaintiff makes no such showing. In fact, the working conditions must have been favorable, because Plaintiff pleaded for his job. Instead of seeing how things might play out were the matter presented to City Council, Plaintiff submitted a resignation letter. However, an "employee is obliged 'not to assume the worst, and not jump to conclusions too fast,'" and "[a]n employee who quits a job in apprehension that conditions may deteriorate later is not constructively discharged." Agnew v. BASF Corp., 286 F.3d 307, 310 (6th Cir. 2002).

Third, "even assuming [Plaintiff] had stated a claim of constructive discharge, a deprivation of property is only the first prong of a due process claim," because Plaintiff "must also show that the deprivation was accomplished without the process that was due under the law." Nunn, 113 Fed. Appx. at 60. Here, the record shows that Plaintiff could have attended the City Council meeting when his resignation was presented and, at the session, he would have been able to address that body.[12]

## C. State Law Claim

Having determined that summary judgment should be granted on Plaintiff's federal claims, the question becomes whether the Court should entertain Plaintiff state law claim for assault. The Court will decline to exercise jurisdiction over that claim.

---

[12] While Plaintiff claims he had no notice of the meeting, "[e]ven if the employee can later show that his resignation was not voluntary, the employer cannot be required to give notice before an employee takes what appears to be a voluntary act." Id.

14

Federal district courts have "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). When a district court has dismissed all claims over which it had original jurisdiction, the court has discretion to "decline to exercise supplemental jurisdiction" over state law claims with respect to which it initially asserted jurisdiction. 28 U.S.C. § 1367(c)(3).

As has been explained:

> . . . The discretion in deciding whether to exercise supplemental jurisdiction over state-law claims is broad. Musson Theatrical, Inc. v. Federal Exp. Corp., 89 F.3d 1244, 1254 (6th Cir. 1996).
>
> When deciding whether to exercise supplemental jurisdiction, a court should consider factors such as judicial economy, convenience, fairness, and comity. City of Chicago v. International College of Surgeons, 522 U.S. 156, 173, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997). However, "'in the usual case in which all federal law claims are eliminated before trial, the balance of factors to be considered . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'" Robert N. Clemens Trust v. Morgan Stanley DW, Inc., 485 F.3d 840, 853 (6th Cir. 2007) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)). Thus, "it is ordinarily prudent for a district court that dismisses a plaintiff's federal claims to decline to reach plaintiff's state law claims" unless the concerns of judicial economy and avoidance of multiplicity of litigation overrides the notion that federal courts should not "needlessly decid[e] state law issues." Sextella-Wright v. Sandusky City Sch. Dist., 2007 WL 451498 at *2 (6th Cir. 2007).

Hollis v. Wilson County, 2009 WL 1651456 at ** 14-15 (M.D. Tenn. June 10, 2009). Thus, in Hollis, the court declined to consider a state negligence claim after the dismissal of the federal claims even though the parties had engaged in discovery, and, in Howard v. Smith County, 2011 WL 4361486 (M.D. Tenn. Sept. 19, 2011), this Court declined to consider state law claims upon dismissal of the federal claims even though discovery had been completed because "[t]he Court's substantive involvement in this case has been limited to considering the record in relation to whether Plaintiffs

have established a triable issue on the federal claims."

Likewise in this case, while the parties have completed discovery, the Court's role thus far has been limited to determine whether Plaintiff has a viable federal claim, and "there is no suggestion that the same discovery will not be of benefit to the parties in relation to litigating the state law claim in state court." Id. (quoting, Staehling v. Metro. Gov't of Nashville and Davidson County, 2008 WL 4279839 at *13 (M.D. Tenn. Sept.12, 2008). Moreover, the liability of Defendants in relation to Plaintiff's state law claim for assault is not altogether clear, and it is prudent for the Court to decline supplemental jurisdiction in favor of state courts which routinely decide such claims.

## IV. **CONCLUSION**

On the basis of the foregoing, the Court will deny Plaintiff's Motion for Summary Judgment, grant Defendants' Motion for Summary Judgment on Plaintiff's federal claims, and decline to exercise jurisdiction over Plaintiff's state law claim for assault.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE